WILMER CUTLER PICKERING
 HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
Andrea J. Robinson
Charles C. Platt
George W. Shuster, Jr.

*Attorneys for SNS Bank N.V. and
SNS Global Custody B.V.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Trustee-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Trustee,<br><br>v.<br><br>SNS BANK N.V., and SNS GLOBAL CUSTODY B.V.,<br><br>Defendants. | Adv. Pro. No. 12-01046 (BRL) |

**DECLARATION OF GEORGE W. SHUSTER, JR. IN SUPPORT OF DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE**

- 2 -

GEORGE W. SHUSTER, JR., hereby declares under penalty of perjury as follows:

1.      I am a member of the bar of this Court and a partner in the law firm Wilmer Cutler Pickering Hale and Dorr LLP, attorneys for defendants SNS Bank N.V. and SNS Global Custody B.V. (collectively, the "SNS Defendants") in this action.  I submit this declaration in support of the SNS Defendants' motion, directed to the United States District Court for the Southern District of New York, for an order withdrawing the reference of this action to the United States Bankruptcy Court for the Southern District of New York.[1]

2.      Attached hereto as Exhibit A is a true and correct copy of the Complaint filed in the United States Bankruptcy Court for the Southern District of New York on February 9, 2012, captioned *Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC v. SNS Bank N.V. and SNS Global Custody B.V.*, Adv. Pro. No. 12-01046.

Dated:  March 30, 2012
        New York, New York

                                                                  /s/ George W. Shuster, Jr.
                                                                George W. Shuster, Jr.

---

[1] The SNS Defendants, foreign financial institutions, do not, by their attorneys filing this Declaration (or by the SNS Defendants filing the corresponding Motion and Memorandum in support thereof or otherwise), submit to or consent to the jurisdiction of any court or admit any fact or waive any right or defense, including, without limitation, regarding the adequacy of service and the personal jurisdiction of any court over the SNS Defendants, all of which rights and defenses the SNS Defendants expressly reserve.

- 2 -

ACTIVEUS 93878146v1

# **EXHIBIT A**

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long
Mark A. Kornfeld
Michelle R. Kaplan
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. _____ (BRL) |
| Plaintiff, | |
| v. | **COMPLAINT** |
| SNS BANK N.V., and SNS GLOBAL CUSTODY B.V., | |
| Defendants. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, for this Complaint against SNS Bank N.V. ("SNS Bank") and SNS Global Custody B.V. ("SNS Global Custody") (collectively, the "SNS Defendants"), alleges the following:

## I. NATURE OF THE ACTION

1. This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property[1] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

2. With this Complaint, the Trustee seeks to recover approximately $74,468,402 in subsequent transfers of Customer Property made to the SNS Defendants by Fairfield Sentry Limited ("Fairfield Sentry"), which was a Madoff feeder fund. Fairfield Sentry is currently in liquidation in the British Virgin Islands ("BVI"). It was a BVI company that had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS. Fairfield Sentry maintained in excess of 95% of its assets in its BLMIS customer accounts. Some of the subsequent transfers from Fairfield Sentry came through Fairfield Sigma Limited ("Fairfield Sigma") and Fairfield Lambda Limited ("Fairfield Lambda"), which each invested 100% of their assets in Fairfield Sentry. Fairfield Sigma and Fairfield Lambda also are in liquidation in the BVI.

3. When the SNS Defendants received the subsequent transfers of BLMIS Customer Property, Defendant SNS Bank was the banking and financial services arm of SNS Reaal N.V., a

---

[1] SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

global bank insurer and investment advisory institution. Also at that time, Defendant SNS Global Custody was an affiliate of Defendant SNS Bank.

## II. JURISDICTION AND VENUE

4. The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by the SNS Defendants as subsequent transferees of funds originating from BLMIS.

5. This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

6. The SNS Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda. The SNS Defendants knowingly received subsequent transfers from BLMIS by withdrawing money from Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda, all Fairfield Greenwich Group ("FGG") managed Madoff feeder funds.

2

7.      By directing investments through FGG, the SNS Defendants knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.  Upon information and belief, the SNS Defendants entered into subscription agreements with Fairfield Sentry and Fairfield Sigma under which they submitted to New York jurisdiction, sent a copy of the agreements to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York.  Defendant SNS Bank also regularly communicated with its FGG account representatives located in FGG's New York City office. The SNS Defendants thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

8.      The SNS Defendants should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

9.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

10.     Venue in this District is proper under 28 U.S.C. § 1409.

### III. BACKGROUND

11.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.  The District Court Proceeding remains pending.

12.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

3

13. On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

14. Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

    a. removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

    b. appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

    c. removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

15. By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

16. At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id*. at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing

[was] wrong, indeed criminal." *Id*. On June 29, 2009, Madoff was sentenced to 150 years in prison.

17. On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id*. at 46.

### IV. TRUSTEE'S POWERS AND STANDING

18. As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

19. Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

20.     Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

21.     The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## V.     THE DEFENDANTS

22.     Defendant SNS Bank is a Dutch public limited company that maintains a place of business at Croeselaan 1, Utrecht 3521 BJ, Netherlands.

23.     Defendant SNS Global Custody is a Dutch private limited company that maintains a place of business at Graadt van Roggenweg 500, Utrecht 3531 AH, Netherlands.

## VI.    THE PONZI SCHEME

24.     BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members.  BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC.  BLMIS had three business units: market making, proprietary trading, and the IA Business.

25.     Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy").  Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies.  Madoff

6

claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

26. The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

27. BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

28. Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

29. For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

30. The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

31. It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

32. Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

33. Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008,

BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

34. Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## VII. THE TRANSFERS

35. Fairfield Sentry received initial transfers of BLMIS Customer Property. Some or all of those initial transfers were subsequently transferred directly or indirectly to the SNS Defendants.

### A. Initial Transfers from BLMIS to Fairfield Sentry

36. The Trustee filed an adversary proceeding against Fairfield Sentry, Fairfield Sigma, Fairfield Lambda, and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

37. During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

38. The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

39. The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

40. The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers." Charts setting forth these transfers are attached as Exhibits A and B.

10

41. Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement"). As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment in the amount of $3,054,000,000. Under the terms of the Settlement Agreement, Fairfield Sentry is obligated to pay $70,000,000 to the Trustee for the benefit of the consolidated BLMIS estate.

### B. Subsequent Transfers from Fairfield Sentry to the SNS Defendants

42. A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the SNS Defendants and is recoverable from the SNS Defendants pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $21,060,551 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to the SNS Defendants (the "Fairfield Sentry Subsequent Transfers"). Upon information and belief, Defendant SNS Global Custody received the Fairfield Sentry Subsequent Transfers for its own benefit and/or as custodian and agent for Defendant SNS Bank. A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

43. The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### C. Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to the SNS Defendants

44. A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the SNS Defendants through Fairfield Sigma

11

and is recoverable from the SNS Defendants pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $752,273,917 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma. Thereafter, the equivalent of approximately $41,540,842 was transferred by Fairfield Sigma to the SNS Defendants (the "Fairfield Sigma Subsequent Transfers"). Upon information and belief, Defendant SNS Global Custody received the Fairfield Sigma Subsequent Transfers for its own benefit and/or as custodian and agent for Defendant SNS Bank. Charts setting forth the presently known Fairfield Sigma Subsequent Transfers are attached as Exhibits D and E.

45. The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sigma Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### D. Subsequent Transfers from Fairfield Sentry to Fairfield Lambda and Subsequently to the SNS Defendants

46. A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the SNS Defendants through Fairfield Lambda and is recoverable from the SNS Defendants pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $52,935,000 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Lambda. Thereafter, the equivalent of approximately $11,867,009 was transferred by Fairfield Lambda to the SNS Defendants (the "Fairfield Lambda Subsequent Transfers"). Upon information and belief, Defendant SNS Global Custody received the Fairfield Lambda Subsequent Transfers for its own benefit and/or as custodian and agent for

Defendant SNS Bank. Charts setting forth the presently known Fairfield Lambda Subsequent Transfers are attached as Exhibits F and G.

47. The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Lambda Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

48. The Fairfield Sentry Subsequent Transfers, the Fairfield Sigma Subsequent Transfers, and the Fairfield Lambda Subsequent Transfers are collectively defined as the "Fairfield Subsequent Transfers."

### COUNT ONE
### RECOVERY OF FAIRFIELD SUBSEQUENT TRANSFERS–
### 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

49. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

50. The SNS Defendants received the Fairfield Sentry Subsequent Transfers, totaling approximately $21,060,551; the Fairfield Sigma Subsequent Transfers, totaling the equivalent of approximately $41,540,842; and the Fairfield Lambda Subsequent Transfers, totaling the equivalent of approximately $11,867,009 (collectively, as defined above, the "Fairfield Subsequent Transfers"). The Fairfield Subsequent Transfers, totaling approximately $74,468,402, are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

51. Each of the Fairfield Subsequent Transfers was made directly or indirectly to, or for the benefit of, the SNS Defendants.

52. The SNS Defendants are immediate or mediate transferees of the Fairfield Sentry Initial Transfers.

13

53. As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the SNS Defendants recovering the Fairfield Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the SNS Defendants as follows:

(a) On the First Claim for Relief, pursuant to sections 550 and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the SNS Defendants recovering the Fairfield Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $74,468,402, for the benefit of the estate of BLMIS;

(b) Awarding the Trustee all applicable fees, interest, costs, and disbursements of this action; and

*[Remainder of page intentionally left blank.]*

14

  (c)  Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.


Dated: February 9, 2012          /s/ David J. Sheehan
   New York, New York       **Baker & Hostetler LLP**
                  45 Rockefeller Plaza
                  New York, New York 10111
                  Telephone: (212) 589-4200
                  Facsimile: (212) 589-4201
                  David J. Sheehan
                  Mark A. Kornfeld
                  Michelle R. Kaplan
                  Torello H. Calvani

                  **Baker & Hostetler LLP**
                  65 East State Street, Suite 2100
                  Columbus, Ohio 43215
                  Telephone: (614) 228-1541
                  Facsimile: (614) 462-2616
                  Thomas L. Long

                  *Attorneys for Irving H. Picard, Trustee*
                  *for the Substantively Consolidated SIPA*
                  *Liquidation of Bernard L. Madoff Investment*
                  *Securities LLC and Bernard L. Madoff*